■ THE PEOPLE OF THE STATE OF NEW YORK ex rel. KENNETH JOHNSON, Appellant, v NEW YORK STATE BOARD OF PAROLE et al., Respondents.—Mikoll, J. P. Appeal from a judgment of the Supreme Court (Plumadore, J.), entered March 4, 1991 in Clinton County, which dismissed petitioner's application, in a proceeding pursuant to CPLR article 70, without a hearing.

Petitioner was released on parole supervision on June 10, 1987 following his incarceration on convictions entered in Supreme Court, Erie County, on July 13, 1984 for two counts of sodomy in the first degree, rape in the first degree and robbery in the first degree. Defendant had been sentenced to four concurrent prison terms of 5 to 15 years.

This proceeding arises out of three incidents. Shortly after 10:00 P.M. on July 16, 1987, a woman (hereinafter J.S.) was robbed and raped at gunpoint by a black male on a street in the City of Buffalo. On July 23, 1987 at approximately 2:15 P.M. to 2:30 P.M., a 19-year-old woman (hereinafter P.F.) was sexually molested and robbed at gunpoint by a black male in a school yard in the Town of Cheektowaga, Erie County, a Buffalo suburb. On that same day approximately two hours after the attack on P.F. a 27-year-old woman (hereinafter S.B.) was robbed and raped at gunpoint next to some railroad tracks near the Thruway Mall, also in Cheektowaga.

Parole Officer Anthony Amico saw a televised composite drawing of a suspect and reported to the police that he thought petitioner, his parolee, resembled the composite drawing. Two of the victims viewed a photo array and picked out petitioner's photo, but only one made a positive identification. Petitioner was arrested on July 27, 1987 and charged with sexual abuse, robbery and criminal use of a firearm related to the first incident of July 23, 1987 involving P.F. On July 28, 1987 Amico filed a violation of release report against petitioner based on the same conduct. On August 3, 1987 the victims picked petitioner out of a lineup. However, the three then knew that the police had a suspect and two had viewed petitioner's picture in the photo array.

On August 4, 1987, following a preliminary parole violation hearing, petitioner was held for a parole revocation hearing which was adjourned indefinitely pending the outcome of any criminal prosecution. Amico filed a supplemental violation of parole release report embracing charges arising from the incidents involving J.S. and S.B. Petitioner was charged with a total of 22 violations. An Erie County Grand Jury issued indictments charging petitioner with the crimes involved in the three incidents. The indictments were dismissed on February 28, 1988 because the waiver of immunity under which petitioner appeared and testified before the Grand Jury had not been properly executed. Petitioner had testified that he was elsewhere at the time of the commission of the criminal conduct alleged and several alibi witnesses also had testified as to petitioner's whereabouts at the time of the incidents.

At the start of a final revocation hearing held before a Hearing Officer on 12 separate days between June 22, 1988 and August 5, 1988, petitioner moved to have the Hearing Officer recuse himself, claiming that public pressure on the Hearing Officer as a candidate for judicial office would make it impossible for him to be objective. This motion was denied and the Division of Parole presented its evidence against petitioner. The identification testimony of the three victims was the only testimony placing petitioner at the scene of the crimes. The two eyewitnesses at the scene of the attack involving P.F. on July 23, 1987 did not identify petitioner as the assailant. In opposition to the charges, petitioner presented extensive alibi evidence, his own testimony, scientific evidence, psychological evidence, polygraph evidence, evidence indicating that another male committed the rapes and proof to show that he did not match the descriptions of the attacker given to the police by the victims. He also demonstrated that

he did not own clothing like that allegedly worn by the attacker.

After the conclusion of the final revocation hearing, the Hearing Officer issued findings of fact and sustained 19 of the 22 violations charged.* The Hearing Officer recommended revocation of petitioner's parole and incarceration until the maximum expiration of his sentence, without reconsideration of parole. On August 26, 1988 the Hearing Officer's findings and recommendations were sustained upon review by a commissioner of respondent Board of Parole (hereinafter the Board). Petitioner filed a timely notice of appeal. Thereafter, without furnishing notice or any opportunity to be heard to petitioner, the Board conducted a "Full Board Case Review" (hereinafter FBCR) and unanimously affirmed the determination. Upon learning of this disposition, petitioner did not continue with his administrative appeal.

Petitioner next commenced this proceeding for habeas corpus relief by order to show cause and petition dated June 26, 1989. Respondents filed a return. Supreme Court, on motion of respondents, dismissed the petition, rejecting petitioner's claims of unfairness and bias on the part of the Hearing Officer in the conduct of the hearing and in his rulings on evidentiary and procedural matters. Supreme Court also found that the revocation determination was supported by substantial evidence and that petitioner was not denied due process by the FBCR procedure because agency rules did not entitle petitioner to notice and opportunity to argue before the full Board. This appeal by petitioner ensued.

Initially, we find that Supreme Court properly rejected petitioner's arguments that he was denied due process because of the Hearing Officer's alleged bias and prejudice. Petitioner did not present sufficient evidence to overcome the presumption of honesty and integrity that attaches to Judges and administrative fact finders (see, People v Moreno, 70 NY2d 403; Matter of Warder v Board of Regents, 53 NY2d 186, 197, cert denied 454 US 1125). Supreme Court, however, erred in certain procedural and substantive rulings relating to due process and, therefore, the judgment should be reversed.

Petitioner argues that the internal FBCR procedure deprived him of notice and the opportunity to be heard which effectively denied him his statutory right to appeal. We find

---

* Three charges relating to possession of a handgun were not sustained because the necessary proof that any handgun was operable was never presented by the Division of Parole.

this contention to have merit. Item 8355 of the Division of Parole's policy and procedure manual provides for the FBCR procedure. This automatic review is mandatory for all final revocation hearing decisions where the delinquent time assessment is more than two years. There is no provision that the review await exhaustion of the normal appeal process nor for notice to the parolee. Petitioner had filed a timely notice of appeal with the Board and had requested a copy of the Hearing Officer's written statement (Executive Law § 259-i [3] [f] [xi]) at the conclusion of the final revocation hearing and by a letter to the Board dated August 12, 1988. While his appeal was pending, however, petitioner became aware of a newspaper story published September 24, 1988 reporting that 14 members of the Board reviewed and unanimously upheld the final revocation hearing determination. Petitioner did not thereafter attempt to perfect his appeal. It appears, as Supreme Court found, that an appeal at that point would be futile in the face of the full Board's review and decision to affirm the determination. A three-member panel could not be expected to overrule this determination, nor would the full Board be likely to overrule itself as this would be impliedly admitting that it did not correctly and fully perform its task in its previous review. Further, the FBCR procedure provided under item 8355 affects a prisoner's liberty interest, and the failure to file this item with the Secretary of State, pursuant to NY Constitution, article IV, § 8, renders it invalid *(see, Matter of Jones v Smith,* 64 NY2d 1003, 1005; *see also, People ex rel. Roides v Smith,* 67 NY2d 899; *People v Cull,* 10 NY2d 123; *Matter of De Zimm v New York State Bd. of Parole,* 135 AD2d 66).

There is no merit to respondents' argument that petitioner's remedy, even if there is a due process violation, is judicial review afforded under 9 NYCRR 8006.4 (c) providing for review when the Board has not made a timely decision of a perfected appeal *(see, People ex rel. Martinez v New York State Bd. of Parole,* 56 NY2d 588, 590; *People ex rel. Mott v Kalamanka,* 112 AD2d 720). Judicial review does not adequately protect petitioner's rights as it does not make him whole. The FBCR procedure followed by the Board was not authorized by any lawful regulation and failed to afford petitioner due process to which he is entitled *(see, People ex rel. Matthews v New York State Div. of Parole,* 58 NY2d 196, 201, 203-204). The FBCR procedure caused unnecessary delay in petitioner's efforts to obtain meaningful review of the adverse final revocation hearing determination. Irreparable harm has occurred. A

finding on appeal that the parole warrant is void because of lack of a preponderance of evidence would entitle him to immediate release to parole. Three years and four months have elapsed since petitioner's due process rights were violated. Restoration of his right to appeal will not make him whole.

Petitioner has also demonstrated a strong probability of reversal of the Hearing Officer's findings and of his release. The identification in this lengthy and unique case is very weak in view of discrepancies in the victims' descriptions of their assailants as compared with petitioner's appearance and physical characteristics, time and distance considerations, and the strong alibi evidence placing petitioner elsewhere. The attacker was described by the victims as a dark-skinned black male, 5 feet 7 inches to 5 feet 9 inches, with a bad complexion. Petitioner is over six feet tall, is light skinned with a good complexion. Critical factual findings and conclusions reached by the Hearing Officer are at times incredible. The conclusion that petitioner committed the two attacks on July 23, 1987 within two hours of each other is irrational considering the time and distance involved. Had respondents not violated petitioner's statutory and due process rights, and had petitioner been afforded the requested statement of the Hearing Officer as required by Executive Law § 259 (3) (f) (xi) and an opportunity to be heard on appeal, the probability of reversal is very high.

According to the findings of the Hearing Officer, petitioner traveled from his place of employment at Daemen College in the Village of Williamsville, Erie County, to the subway station at the State University of New York at Buffalo (hereinafter SUNY) campus on Main Street sometime after he and a co-worker had completed a telephone conversation with Robert Hausrath, which Hausrath recalled occurred at 1:15 P.M. Petitioner would have then had to board an underground train, which left at 1:20 P.M., arrive in downtown Buffalo at the Church Street stop at 1:37 P.M., and walk a block or two to Genesee Street to take a 1:40 P.M. bus which then arrived in Cheektowaga at 2:14 P.M. Petitioner then would have engaged in the attack on P.F. from 2:15 P.M. to 2:30 P.M. in Cheektowaga. Petitioner would have had to have fled that attack scene at about 2:30 P.M., made a telephone call at 2:35 P.M. and then returned by bus to downtown Buffalo to be at the Empire Bank with his mother at 4:00 P.M., where he remained until 4:15 P.M. to open an account. Petitioner would have then returned to Cheektowaga by bus leaving downtown Buffalo at

4:30 P.M. to commit the attack on S.B. shortly before 5:00 P.M. in Cheektowaga. Petitioner also would have had to change clothes and his appearance from clean and odor free to dirty and bearing detectable body odor.

Additionally, the Hearing Officer, in evaluating the purpose of petitioner's voluntary submission to DNA testing, based his evaluation on the mistaken determination that petitioner, if the testing had gone against him, would not have lost anything because he could not be charged and sentenced for the crimes. The Hearing Officer stated that both the DNA and the polygraph were employed after the criminal charges were dismissed or appeared to be dismissed. This is not the fact. According to the record, petitioner volunteered for DNA testing prior to January 22, 1988 at a pretrial conference and the indictments were not dismissed until February 25, 1988. A letter dated January 5, 1988 from the Erie County District Attorney's office further indicates that petitioner was committed to DNA testing before a pretrial conference held on January 4, 1988. The Hearing Officer stated that he believed that petitioner did not take any gamble in submitting to the DNA test and commented in his parole revocation decision received by the Division of Parole on August 29, 1988 that "[h]ad the test been performed a year ago I might feel different". Thus, this mistaken fact colored the Hearing Officer's evaluation of this case and invalidated his conclusions *(see, Matter of Brazill v New York State Bd. of Parole,* 76 AD2d 864).* Had petitioner's arguments for reversal been entertained, the reviewing authority could have concluded that the Hearing Officer's findings were not supported by a preponderance of the credible evidence.

In any event, petitioner correctly argues that the Hearing Officer's determination is not supported by a preponderance of the evidence. Petitioner is therefore entitled to release from custody and restoration to parole status *(see, People ex rel. Saafir v Mantello,* 163 AD2d 824, 825-826; *People ex rel. Pickett v Ruffo,* 96 AD2d 128, 131; *see also, People ex rel. McGee v Walters,* 96 AD2d 605, *affd* 62 NY2d 317). Discrepancies and inconsistencies in the identification and other evidence render material conclusions reached by the Hearing Officer incredible, speculative and unwarranted.

*I. Incident of July 16, 1987*

J.S. was raped and robbed at gunpoint on a Buffalo street a little after 10:00 P.M. on July 16, 1987 by a black male. Immediately after the attack she described the assailant to the police as a very dark-skinned black male, with a round

face, 25 years old and about 5 feet 6 inches tall. At a later occasion she told the police that her assailant was probably a little taller, 5 feet 7 inches to 5 feet 11 inches. Her assailant was not wearing glasses, did not squint and did not act as if he needed glasses. J.S. said that the man was dressed in blue denim jeans, a white T-shirt and white leather Hirachis shoes. She could not pick out anyone from a police book of mug shots. At a police lineup on August 5, 1987, J.S. did not identify petitioner in the first lineup. During a second lineup, where the subjects removed their glasses and spoke, she identified petitioner as her attacker. At the time of the final revocation hearing, she positively identified petitioner but she then knew that he was a convict out on parole. The original description given by J.S. did not match petitioner, who was six feet tall, 35 years old, nearsighted and regularly wore glasses. There was also testimony establishing that petitioner did not own clothes like the clothes worn by J.S.'s assailant.

At the hearing, John Simich, an expert forensic chemist, testified that he performed blood tests of semen found on the clothing of J.S. and concluded that petitioner could not have been her attacker. Simich did state that because J.S. was menstruating at the time, it was possible that some of her blood mixed with the semen. Nevertheless, he opined that it was more likely than not that the blood in the semen was that of the attacker, so petitioner could not be the rapist. Additionally, petitioner voluntarily submitted to a DNA print analysis which turned out to be inconclusive. Expert polygraph evidence was also received which demonstrated that petitioner was not lying when he stated that he did not attack J.S.

Petitioner produced alibi evidence that he was elsewhere during the time in question including evidence that he spoke on the telephone with Anthony Haggins from his mother's house from 9:32 P.M. until 9:42 P.M. on July 16, 1987. Petitioner further produced expert psychological evidence as to his personality.

## II. First Incident of July 23, 1987

When P.F. was robbed and sexually abused at gunpoint at approximately 2:15 P.M. to 2:30 P.M. on July 23, 1987, there were two witnesses to the attack. P.F. told the police that her assailant was a black male, 5 feet 7 inches to 5 feet 8 inches tall, 25 to 27 years of age with a strong body odor and wearing dark sunglasses with dark frames, Wrangler blue jeans and a tan shirt. Significantly P.F. is 5 feet 11 inches tall and should have easily perceived whether her attacker was shorter than she. The eyewitnesses said the assailant was dark complexioned, 5 feet 8 inches, husky and in his mid-20s. Although she

was able to pick petitioner's photograph from a photo array the next day, she admitted that only two pictures of the six in the array were close to petitioner's picture and that petitioner's picture was the only one that came close to the description that she had given the police. She again identified petitioner at the hearing, but by then she knew that he was a convict on parole.

Petitioner had been at work that day and produced strong evidence that he was elsewhere at the time in question including the testimony of a co-worker, Cindy Konovitz. He also produced testimony that when seen shortly before the incident he was not wearing the clothing that the assailant was said to be wearing. Petitioner also produced polygraph evidence and evidence that petitioner made a telephone call to the SUNY campus at 2:35 P.M. at the approximate time of the attack. The alibi evidence included Konovitz's testimony that she dropped petitioner off at the entrance to the Metro-rail station at SUNY at 1:27 P.M. according to the clock in her automobile. There was evidence that, in order to reach the scene of the attack from that station, he would have had to board a train for downtown Buffalo that left at 1:20 P.M. and catch a transfer bus leaving downtown Buffalo and arriving in Cheektowaga at 2:14 P.M. Other testimony placed him at the home of his mother in downtown Buffalo at 2:00 P.M. where he remained until he and his mother went to a bank in downtown Buffalo at 4:00 P.M.

*III. Second Incident of July 23, 1987*

S.B. was raped and robbed at gunpoint near some railroad tracks near the Thruway Mall in Cheektowaga somewhere between 4:30 P.M. and 5:00 P.M. S.B. described her assailant as a 5 foot 10 inch black male, at most 30 to 35 years old, thin, with a very bad complexion, wearing messy clothing and having a distinct body odor. S.B. did not mention to the police that the assailant had glasses. She could not make a positive identification from the six-man photo array which P.F. had also viewed. She picked petitioner out of a police lineup on August 5, 1987. Petitioner was the only person who appeared in both the lineup and the photo array. At the hearing, S.B. positively identified petitioner as her assailant, but at that time she knew that he was a convict on parole.

Petitioner produced independent proof that he was at the Empire Bank in downtown Buffalo at 4:00 P.M. until at least 4:15 P.M. with his mother opening a bank account. There was also evidence that he went shopping with his mother after leaving the bank and was at home near downtown Buffalo at

5:00 P.M. To commit this rape, petitioner would have had to have taken a 4:32 P.M. bus from downtown Buffalo which arrived in Cheektowaga near the rape scene at 4:56 P.M.

In addition to this strong alibi evidence, another person, Victor Thomas, a black man fitting the general description of the assailant, told the police in Boston, Massachusetts, upon his arrest there in S.B.'s automobile that he had raped a white woman with blonde hair, wearing white shorts, near a railroad track by the Thruway Mall in Cheektowaga. Thomas is dark skinned with a bad complexion and about 5 feet 8 inches tall. Thomas was not, however, identified in a lineup when viewed by the three victims. Although Thomas gave accurate details of the attack, he could not take police to the scene and subsequently said he did not commit the rape.

Petitioner's evidence also included polygraph and psychological evidence that he did not commit the crime and the fact that he volunteered for DNA testing which proved to be inconclusive. Evidence demonstrated that petitioner was employed as a computer operator under a contract paying $15,000 for the year and perhaps more, was well groomed and well educated.

As previously discussed, material factual conclusions reached by the Hearing Officer are unwarranted, incredible and speculative. Factual conclusions are also invalid based on the Hearing Officer's mistaken conclusion that petitioner did not submit to DNA testing until the criminal indictment had been dismissed.

Yesawich Jr., Crew III and Harvey, JJ., concur. Ordered that the judgment is reversed, on the law, with costs, petition granted, and petitioner discharged from custody and returned to parole status.